**BADGER METER, INCORPORATED,**
Plaintiff–Appellant, Cross–
Appellee,

v.

**GRINNELL CORPORATION and**
Mueller Company, Defendants–
Appellees, Cross–Appellants.

Nos. 92–3950, 92–4074, 93–
1373 and 93–1555.

United States Court of Appeals,
Seventh Circuit.

Argued Sept. 17, 1993.

Decided Jan. 18, 1994.

Wayne E. Babler, Jr. (argued), Anthony A. Tomaselli, Andra J. Palmer, Quarles & Brady, Milwaukee, WI, for Badger Meter, Inc., in Nos. 92–3950, 92–4074.

Jonathan H. Margolies, Gary A. Ahrens (argued), Michael, Best & Friedrich, Milwaukee, WI, for Grinnell Corp., Mueller Co. in Nos. 92–3950, 92–4074, 93–1373 and 93–1555.

Wayne E. Babler, Jr. (argued), Anthony A. Tomaselli, Quarles & Brady, Milwaukee, WI, for Badger Meter, Inc. in Nos. 93–1373 and 93–1555.

Before POSNER, Chief Judge, CUMMINGS, Circuit Judge, and ZAGEL, District Judge.*

CUMMINGS, Circuit Judge.

In this trade dress infringement case plaintiff Badger Meter, Incorporated ("Badger"), which received a favorable jury verdict below, appeals from the district court's issuance of a permanent injunction against the defendants that the plaintiff believes is inadequate, from the denial of monetary damages under 15 U.S.C. § 1117(a), and from the denial of its motion for attorneys' fees under that same section. In a separate appeal, consolidated with this one, Badger appeals the district court's determination, upon plaintiff's motion for judicial review, that defendants' redesigned water meter does not violate the terms of the permanent injunction.[1] The defendants Grinnell Corporation ("Grinnell") and Mueller Company ("Mueller")

cross-appeal the judge's denial of their renewed motion for judgment as a matter of law (j.n.o.v.). This Court has jurisdiction over all the appeals pursuant to 28 U.S.C. § 1291.

## Background

Plaintiff, the manufacturer of a "positive displacement nutating disk" small water meter, brought suit against defendants, manufacturers of a similar water meter, for trade dress infringement pursuant to 15 U.S.C. § 1125(a).[2] In 1989 defendant Grinnell acquired the assets of one of Badger's competitors, Hersey Products, Inc., and together with defendant Mueller (both Grinnell and Mueller are subsidiaries of the same parent, Tyco Laboratories, Inc.) continued to manufacture Hersey's previously-developed small water meters and distribute them under the Hersey name. (The parties sometimes refer to defendants Grinnell and Mueller collectively as "Hersey." This opinion will do likewise.) The meters of which Badger complains were introduced by defendants in January 1992 as their "400 Series II" model meters, referred to by the parties as the "Hersey Series II."

Water meters are used by the providers of water services—such as municipal and private water utilities, trailer parks, and the like—in order to determine the level of consumers' water use. Such meters are manufactured in accordance with standards provided by the American Water Works Association ("AWWA") for different types of water meters. Many water utilities require either extensive testing or a number of years of in-service use before they will accept a new water meter as qualified for their systems.

Water meters are classified as either large or small. Small water meters are primarily used in homes that have an inlet pipe of two inches and under, and such meters make up 95% of meters sold in the United States.

---

* Hon. James B. Zagel, Northern District of Illinois, sitting by designation.

1. Badger did not characterize its motion for judicial review as a contempt petition (R. 443 at 1) but that is how the parties characterize it before this Court. We refer to Badger's motion for

judicial disapproval, then, as a motion to hold defendants in contempt.

2. Plaintiff also alleged false and misleading advertising. It does not appeal the dismissal of that claim.

Small water meters are further classified as positive displacement or non-positive displacement type. Positive displacement type small water meters constitute over 90% of all small water meters sold. They are covered by AWWA standard C700. Meters that meet AWWA standard C700 can utilize either a nutating disk or an oscillating piston to measure the level of water displacement in the measuring chamber. Both positive displacement small water meters involved in this case utilize nutating disks.

The nutating disk positive displacement small water meters in this case have two basic parts: The first is the measuring chamber, assembled as two halves and located inside a closed bronze or plastic chamber. The measuring chamber holds a known volume of water. As one full volume of water flows into the measuring chamber it causes the disk inside to make one complete nutation. The second part of the meter is the register, which records the volume of water passing through the measuring chamber. This register is located above the measuring chamber, and the action of the disk nutating below causes gears contained within the register to rotate, which in turn cause an odometer to display the number of gallons used.

Badger refers to itself as one of the four "historically significant" manufacturers of positive displacement small water meters, generally having a 25–28% market share. Badger characterizes Hersey as a "small player" and does not list it among the four historically significant firms. The water meter that Badger claims Hersey has infringed is its "Recordall" series of meters. These nutating disk positive displacement small water meters are described as having:

> [A] raised lens with vertical scoring; a deep cup-shaped cover of plastic or bronze; a register dial face with unused holes in the 0 and 5 positions; gears in the register of various colors with shafts extending through the register dial face and appearing as colored dots; three legs extending from the register dial face to the register bottom plate between which the colored

gears are viewable; and a main bronze housing with the measuring chamber of a particular geometric configuration and nutating disk housed inside.

Pl. Opening Br. at 10–11.[3] This version of the Recordall meter was designed in 1986 or 1987 but many of the features described above were utilized in the Recordall meter as early as 1972.

In 1988 Hersey attempted to design a new model positive displacement meter based on existing designs by its competitors, but abandoned the project in 1989 in favor of a private labeling arrangement with Kent, one of the aforementioned historically significant manufacturers of positive displacement water meters. Although the meter was manufactured by Kent it was labeled with the Hersey name and Hersey serial numbers, and in no way indicated any connection with Kent. Kent did, however, sell the same meter under its own name. Plaintiff introduced evidence that the Kent meter sold under the Hersey name was "commonly recognized by water utility personnel as having actually originated with Kent." Pl. Opening Br. at 14.

Hersey apparently became dissatisfied with the Kent meter, and in 1990 resumed examination of its competitors' products in an attempt to design a meter of its own. Plaintiff introduced evidence that Hersey minutely copied the parts of its Recordall meter. Hersey first made drawings of the parts in the Badger measuring chamber, sending the drawings and actual Badger parts out to vendors for tooling and parts estimates. Then it made drawings of the parts in the Badger register, once again sending both drawings and actual Badger parts out for estimates. Badger introduced a handwritten note between two Grinnell employees in charge of developing the new meter that stated the objective of this part of the project was to "Design a water meter register identical to the Badger except for two minor changes. First change is to relocate the low flow indicator to the green spindle. Second change is to modify indicator arm so that it

---

**3.** Because this opinion deals with two appeals that have been consolidated we have two sets of briefs with which to contend. This opinion refers to the briefs in the main appeal simply as "Br." and to the briefs in the appeal from the contempt proceeding as "Contempt Br."

would lend itself to replacement with a sensor magnet." I Pl. Supp. App. 127.

According to Badger,

[The result was] a virtual copy of the Badger meter, in function and form, inside and out. . . . Even the gear colors, shapes, and numbers of teeth [were] the same. The register dial face [had] the same unused holes at the 0 and 5 positions. The odometer [was] nominally larger [apparently because the supplier believed that Badger owned the tooling for the odometer that Hersey had provided for a cost estimate] . . . which led to slightly longer gear shafts and a nominally larger raised lens and register face. The measuring chamber and disk for all intents and purposes were identical to the Badger, and everything was similar, inside and out.

Pl. Opening Br. at 17–18 (citations to the record omitted; bracketed material gleaned from *id.* at 17). Badger introduced a great deal of evidence that the internal parts of the Hersey meter were interchangeable with the parts of the Badger meter, and that historically the parts of different manufacturers' water meters were not interchangeable. Apparently not much was made of this fact in argument to the jury, but Badger's appeals before this Court rely on it.

The Hersey Series II was marketed to customers that would not require a test period. Hersey wanted to "avoid positioning the [Series II meter] as 'new' product that would then require lengthy testing (up to 5 years) of specifications by municipalities prior to sales." I Pl. Supp. App. 53.

Badger claims that although Hersey copied the Recordall meter, it did not do a very good job. "Badger purchased 12 Hersey 430 Series II meters in February, 1992. Each meter inspected had cellophane adhesive tape around a portion of the register assembly for shimming; six of ten meters tested failed to meet AWWA C700 performance standards, . . . several units had paint runs, paint blisters, and areas of rust." Pl. Opening Br. at 20 (citations to the record omitted).

In March 1992 Badger filed this action in the district court, alleging that the Hersey Series II model meters infringed on the trade dress of its Recordall line of meters. Badger's motion for a preliminary injunction was denied on the ground that although Badger had demonstrated a likelihood of success on the merits, there had been no showing of irreparable harm and the balance of harms favored Hersey. In August 1992 a jury trial commenced. After all the evidence had been presented, both parties moved for judgment as a matter of law, and both motions were denied. The court submitted the issue of infringement to the jury, but refused Badger's request to submit to the jury the issue of whether any infringement had been willful.

The jury returned the following special verdict:

1. Is any trade dress of the Badger Recordall 25 water meter inherently distinctive? Answer: Yes.

2. Has any trade dress of the Badger Recordall 25 water meter acquired secondary meaning? Answer: Yes.

IF YOU ANSWERED "YES" TO QUESTION 1 OR QUESTION 2, PROCEED TO QUESTION 3; OTHERWISE PROCEED NO FURTHER.

3. Is the Hersey 430 Series II meter sufficiently similar to any trade dress of the Recordall 25 to create a likelihood of confusion among purchasers as to the origin of defendant's product? Answer: Yes.

IF YOU ANSWERED "YES" TO QUESTION 3, PROCEED TO QUESTION 4; OTHERWISE PROCEED NO FURTHER.

4. Is the alleged trade dress of the Badger Recordall 25 water meter functional? Answer: No.

After the jury returned this verdict Hersey made a renewed motion for judgment as a matter of law, which was denied, and Hersey appeals on the ground that no reasonable jury could have found in Badger's favor on the issue of likelihood of confusion.

Having won on the merits Badger sought a broad permanent injunction against Hersey. The court did not grant such a broad injunction but instead entered a fairly narrow one that specifically listed the elements of the Hersey Series II that Badger had initially

claimed constituted Hersey's infringement. Badger appeals from the ·denial of its requested injunction.

In addition to seeking injunctive relief Badger also sought damages and attorneys' fees. Because Badger had elected to have the court determine a just monetary award under 15 U.S.C. § 1117(a) a trial on damages was held by the district judge, who refused to award Badger any damages. Badger appeals from the judge's denial of a monetary award. The judge also refused to award attorneys' fees, and Badger again appeals.

After the permanent injunction was issued Hersey modified its Series II meter. Badger requested judicial disapproval of the new meter, which the district court denied. In a separate appeal, which was consolidated with this one, Badger appeals from the denial of judicial disapproval of the new Hersey Series II meter.[4]

Because all of the appeals are without merit we affirm the district court in all respects.

### Analysis

#### A. The Likelihood of Confusion

■ "Trade dress" refers to the total image of a product, including size, shape, color combinations, graphics, packaging and label. See, e.g., *Computer Care v. Service Systems Enterprises, Inc.*, 982 F.2d 1063, 1067 (7th Cir.1992); *NutraSweet Co. v. Stadt Corp.*, 917 F.2d 1024, 1027 n. 1 (7th Cir.1990), certiorari denied, 499 U.S. 983, 111 S.Ct. 1640, 113 L.Ed.2d 735; *Roulo v. Russ Berrie & Co., Inc.*, 886 F.2d 931, 935 (7th Cir.1989), certiorari denied, 493 U.S. 1075, 110 S.Ct. 1124, 107 L.Ed.2d 1030. A party may obtain relief under 15 U.S.C. § 1125(a) for trade dress infringement if it can prove (1) its trade dress is protectible; and (2) its trade dress was infringed. Cf. *Blau Plumbing, Inc. v. S.O.S. Fix–It, Inc.*, 781 F.2d 604, 610 (7th Cir.1986); see also *Taco Cabana Inter-*

*national, Inc. v. Two Pesos, Inc.*, 932 F.2d 1113, 1117–1118 (5th Cir.1991), affirmed by — U.S. ——, .112 S.Ct. 2753, 120 L.Ed.2d 615. Even if the plaintiff meets its burden on these issues, if the defendant can show that the plaintiff's trade dress is "functional," then it has an affirmative defense to the allegation of infringement. See, e.g., *Abbott Laboratories v. Mead Johnson & Co.*, 971 F.2d 6, 20 (7th Cir.1992); *Computer Care*, 982 F.2d at 1068.

■ A plaintiff satisfies the first prong, protectible trade dress, if it can show either that its trade dress is inherently distinctive or that it has acquired a secondary meaning. *Two Pesos, Inc. v. Taco Cabana, Inc.*, — U.S. ——, ——, 112 S.Ct. 2753, 2758. In this case the jury found both that Badger's trade dress was inherently distinctive and that it had acquired a secondary meaning. Hersey did not move the court for j.n.o.v. on this issue. A plaintiff satisfies the second prong, infringement, if it can show that the similarity of the defendant's trade dress to that of the plaintiff is such as to create a likelihood of confusion on the part of consumers as to the source of the goods. See, e.g., *Computer Care*, 982 F.2d at 1068. The jury found in Badger's favor on this prong as well. Hersey made a renewed motion for judgment as a matter of law on the issue of likelihood of confusion, and appeals the denial of that motion.[5]

■ This Court reviews the denial of a renewed motion for judgment as a matter of law *de novo*. *McNabola v. Chicago Transit Authority*, 10 F.3d 501, 515 (7th Cir.1993). Such motions will be granted " 'only if, when the evidence is viewed in the light least favorable to the moving party, the verdict is unsupported.'... [The verdict] would be 'unsupported' only if the record contains no evidence that could have supported the jury's finding ....'" *Video Views, Inc. v. Studio 21, Ltd.*, 925 F.2d 1010, 1021 (7th Cir.1991)

---

4. Badger filed a notice of appeal on February 12, 1993, which was assigned docket number 93–1373 in this Court. On February 26 Badger filed a second notice of appeal, assigned docket number 93–1555 in this Court, in case certain motions filed by Hersey subsequent to February 12 had nullified the first notice of appeal. Because Hersey's actions did not nullify the first notice of

appeal, the second one is unnecessary and duplicative. It is accordingly dismissed.

5. The jury also found against Hersey on the affirmative defense of functionality. Hersey did not move the court for j.n.o.v. on this issue.

(quoting *Isaksen v. Vermont Castings, Inc.,* 825 F.2d 1158, 1163 (7th Cir.1987), certiorari denied, 486 U.S. 1005, 108 S.Ct. 1728, 100 L.Ed.2d 193), certiorari denied, —— U.S. ——, 112 S.Ct. 181, 116 L.Ed.2d 143. In this case the record does contain evidence to support the jury's finding that the Hersey Series II meter was sufficiently similar to the trade dress of the Badger Recordall meter to create a likelihood of confusion among purchasers as to the origin of Hersey's product; hence, Hersey's cross-appeal must fail.

In assessing the likelihood of marketplace confusion, the factors to be considered include:

[T]he similarity of the trade dresses, the products to which the trade dresses are attached, the area and manner of concurrent use, the degree of care likely to be exercised by consumers, the strength of the plaintiff's trade dress, and the actual confusion and intent on the part of the alleged infringer to pass off the infringer's goods as those of the plaintiff.

*Roulo,* 886 F.2d at 937. The weight to be assigned to each of these factors will differ according to the case. *International Kennel Club of Chicago, Inc. v. Mighty Star, Inc.,* 846 F.2d 1079, 1087 (7th Cir.1988).

Hersey appears to concede the district judge's observation that "the meters are outwardly very similar in appearance." R. 246 at 12. The products to which the trade dresses are attached are the same. Their area and manner of concurrent use are the same. These facts militate in favor of the jury's finding of likelihood of confusion. Hersey musters an impressive arsenal of arguments against this finding, but its arguments all address either the weight to be assigned to the evidence or the inferences to be drawn from it. Such arguments are inappropriate in the context of a motion for judgment as a matter of law. The Court in considering an appeal from the denial of a motion for j.n.o.v. is required to draw every permissible inference in favor of the non-movant and it may not re-weigh the evidence. *McNabola,* 10 F.3d at 515.

Hersey addresses three arguments to the inferences that may be drawn from the evidence. First, it argues that "the prominent use of the parties' respective trademarks, names and logos on the meters, packaging and advertising brochures" militates against a finding that the trade dresses themselves are confusingly similar. Def. Opening Br. at 32–33. Badger responds that Hersey is known within the relevant market to have privately labeled the Kent small water meter for several years in the late 1980s, and that the prominent use of its trademark on a water meter that is in other respects almost identical to Badger's will not prevent purchasers from inferring that Badger and Hersey are involved in a similar deal. We will allow the inference that the similar trade dresses, in combination with Hersey's past practice of private labeling, could mislead consumers into believing that Badger was the source of the Hersey Series II water meter.

Next Hersey argues that because purchasers keep records about their water meters and know that the manufacturer is responsible under the warranty, there is no possibility of consumer confusion as to source. Dissatisfied customers, it claims, will not seek to hold Badger responsible for Hersey-labeled meters. But even if Hersey is correct that dissatisfied customers will not seek satisfaction from Badger on account of any particular Hersey-labeled meter, this does not address Badger's argument that customers are likely to believe that Badger, through a private labeling agreement, is the ultimate source of the Hersey meter. This inference too is permissible and so we shall make it here.

Finally, Hersey argues that water meters are not impulse purchases and that utilities purchasing on negotiation or bid know how to determine the source of the product regardless of the appearance of the trade dress. Badger responds with evidence indicating that the purchasers of small water meters vary in sophistication. In addition it argues that while customers might know how to determine the source of a water meter, this does not entail that they will actually do so if they erroneously believe after internal and external inspection of the Hersey meter that

it was actually manufactured by Badger. Once again we allow the inference.

Hersey also addresses several arguments to the weight to be assigned to the evidence. It argues that Badger's failure to prove any actual consumer confusion militates against a finding of the likelihood of such confusion. This might be true, and were we the finders of fact we might be persuaded by the argument, but such an argument cannot defeat a jury verdict. Badger did present some evidence of actual confusion, not of consumers, but rather of employees of Badger and Hersey's competitors who apparently wanted to know why Hersey was private-labeling a Badger meter. In addition Badger provided some expert testimony that consumers were likely to be confused by the similarities between the two lines of meters. The jury was entitled to weigh Badger's evidence more heavily than Hersey wishes, and we will not re-weigh it here.

Likewise, Hersey argues strenuously that Badger's failure to introduce any market survey evidence of likely consumer confusion militates against finding such a likelihood; once again, however, this goes to the weight and not to the sufficiency of the evidence.

Drawing every permissible inference in favor of Badger, and declining to re-weigh the evidence, we agree with the district court that there was sufficient evidence in support of the jury's verdict. The district court will be affirmed on the defendants' cross-appeal.

### B. The Injunction

Following the jury verdict in its favor, Badger submitted a proposed judgment that included the following injunction:

> Defendants shall be and hereby are permanently enjoined from marketing, selling or making any water meter utilizing the trade dress of the Badger Recordall line of water meters and any substantially similar trade dress. This injunction includes but is not limited to water meter products by Defendants as their 400/500 "Series II" water meters.

R. 309 at 3. The district court, however, entered a narrower injunction addressing some, but not all, of the items of Badger's trade dress that it had claimed Hersey infringed:

> [J]udgment is entered ... permanently enjoining the said defendants ... from manufacturing, distributing, selling, or advertising into commerce any domestic water meter with the trade dress of the Badger Recordall 25 water meter consisting of a number of elements including a raised lens with vertical scoring, a deep cup-shaped cover, colored gears which can be viewed through the sides of the lens, and colored gear shafts extending through the register dial face and visible to the user....

R. 326. Following the entry of this judgment Hersey modified its Series II meter. Before Hersey began to market the new meter Badger moved the district court for judicial review, seeking disapproval of the modified meter on the ground that it did not avoid "all possibility of confusion" with the Badger Recordall meter. R. 413 at 1. The court below denied plaintiff's motion for judicial disapproval of the modified meter and entered an order declaring that the new meter was not in violation of the permanent injunction.

Badger appeals the district court's initial refusal to enter the broad injunction it sought and also appeals that court's determination that the modified meter is not in violation of the injunction, arguing that the determination is premised on an error of law and is an abuse of discretion.

### 1. The Adequacy of the Injunction

A trial judge has considerable discretion in fashioning an injunction in response to trademark or trade dress infringement, *Soltex Polymer Corp. v. Fortex Industries, Inc.*, 832 F.2d 1325, 1329 (2d Cir.1987), and we will disturb its injunction only for an abuse of that discretion, including an erroneous conclusion of law or a clearly erroneous finding of fact. Cf. *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 405, 110 S.Ct. 2447, 2460, 110 L.Ed.2d 359.

Badger's argument is as follows: Trade dress is the overall image of a product, *Vaughan Mfg. Co. v. Brikam International, Inc.*, 814 F.2d 346, 348 n. 2 (7th Cir.1987), which has been defined to include, in one case, the interior kitchen floor plan of a

restaurant. *Two Pesos,* —— U.S. at —— n. 1, 112 S.Ct. at 2755 n. 1 (quoting, without criticism, instructions concerning trade dress given to the jury in that case). In this case, the total image of the Badger Recordall meter is not only the previously-described appearance of its register but also the internal appearance of its measuring chamber. Because Badger introduced evidence that buyers examine water meters inside and out, it argues that despite any change in the external appearance of Hersey's meter, buyers will continue to be confused by the internal similarities of the two meters, in particular by the interchangeability of the meters' parts.

■■■■ While protectible trade dress can include the combination of otherwise non-protectible functional elements, *Computer Care,* 982 F.2d at 1071; *Service Ideas, Inc. v. Traex Corp.,* 846 F.2d 1118, 1123 (7th Cir. 1988); *Vaughan,* 814 F.2d at 350, this Court is loath to protect the clearly functional aspects of a product in the manner suggested here by the plaintiff. The proper method of protecting the internal parts of plaintiff's measuring chamber is by patent; if such protection is unavailable, or if plaintiff did not avail itself of such protection, it should not seek to deprive consumers of the benefits of competition by means of overbroad characterizations of its "trade dress." Having said this, however, the Court disposes of plaintiff's claims without holding that, as a matter of law, the internal appearance of its measuring chamber could never fall within the ambit of protectible trade dress. It is clear that the jury's special verdict in favor of plaintiff did not encompass the internal appearance of the measuring chamber as part of the meter's trade dress.

■■■■ The district court instructed the jury on plaintiff's trade dress as follows:

The alleged trade dress of the Badger Recordall 25 water meter consists of a number of elements, including a raised lens with vertical scoring, a deep cup-shaped cover, colored gears which can be viewed through the sides of the lens and colored gear shafts extending through the register dial face and visible to the user.

R. 425 at 168–169. This description of the trade dress was consistent with that in Badger's Complaint, R. 2 at 3–5, and Badger did not object to the wording of this instruction in conference with the judge. R. 420 at 5–6. Neither the Complaint nor the jury instructions mentions any aspect of the internal appearance of Badger's measuring chamber. For this reason, the special verdict indicating that plaintiff's trade dress was protectible and that it had been infringed must have reflected the jury's understanding that the "trade dress" at issue in this case included the elements listed above and not the internal appearance of plaintiff's measuring chamber. The injunction entered by the district judge also mirrored the language of this jury instruction. Therefore the injunction met plaintiff's stated concern at trial about its trade dress.

The district court will be affirmed on this part of plaintiff's main appeal.

### 2. The Contempt Proceedings

In its second appeal Badger argues that Hersey's modified meter does not avoid "all possibility of confusion" with its Recordall meter. The new meter (the "Series IIS" meter) is similar to the infringing one except that the colored gear shafts and unused holes are no longer visible in the register dial face, and a plastic collar now extends along the sides of the raised lens, partially obscuring the gears and the vertical scoring on the lens sides. Badger complains that the internal parts of Hersey's measuring chamber continue to be interchangeable with its parts; that the plastic collar is of a blue color similar to the "Badger blue" still used by Badger on some of its packaging and literature although no longer used on the Recordall water meter; and that elements of the Series IIS meter are unchanged from the infringing Series II meter although these elements are specifically named in the injunction.

■■■■ This Court reviews the disposition of contempt petitions for abuse of discretion. *Stotler and Co. v. Able,* 870 F.2d 1158, 1163 (7th Cir.1989). When a discretionary ruling is based on an error of law, abuse of discretion is established. *Cooter & Gell,* 496 U.S. at 405, 110 S.Ct. at 2460. We review

the district court's conclusions of law *de novo*. *Forum Corp. of North America v. Forum, Ltd.;* 903 F.2d 434, 438 (7th Cir. 1990). A district court's findings of fact are reviewed under the clearly erroneous standard, *id.;* when a discretionary ruling is based on a clearly erroneous finding of fact, abuse of discretion is likewise established. *Cooter & Gell,* 496 U.S. at 405, 110 S.Ct. at 2460. Badger argues both that the district court's disposition of its motion for judicial review was premised on an error of law and that it was based on clearly erroneous findings of fact.

■■■ When one party has a protectible trade dress, later entrants into the market are under a duty to select a trade dress that avoids a "likelihood" of consumer confusion. *Forum Corp.,* 903 F.2d at 439, 440. Badger argues that once a party has been found to have infringed on another's trade dress, it is subject to a more stringent duty: to select a trade dress that avoids "all possibility" of consumer confusion. This position is at odds with current theories of trade dress protection, and misreads the law of this Circuit.

■■■ Competitors are generally privileged to copy one another's products, *Sears, Roebuck & Co. v. Stiffel Co.,* 376 U.S. 225, 231, 84 S.Ct. 784, 788, 11 L.Ed.2d 661, because consumers benefit from the option to buy a copy that has "some added premium (*e.g.,* faster delivery, cheaper pricing)" provided by the competitor. *Hypertherm, Inc. v. Precision Products, Inc.,* 832 F.2d 697, 700 (1st Cir.1987). In general, protection from copying is extended only when competitors' freedom to copy would in some way harm consumers. In the case of trade dress, copying protectible trade dress interferes with consumers' ability to identify the source of goods by their appearance and packaging and therefore interferes with consumers' ability to reward or punish a manufacturer by seeking a superior product or shunning an inferior one. *Scandia Down Corp. v. Euroquilt, Inc.,* 772 F.2d 1423, 1429–1430 (7th Cir.1985), certiorari denied, 475 U.S. 1147, 106 S.Ct. 1801, 90 L.Ed.2d 346. Hence competitors are required to select trade dresses that avoid a likelihood of consumer confusion as to the source of their goods. *Forum*

*Corp.,* 903 F.2d at 439. No consumer interest would be served by placing a prior infringer under a greater competitive disability than others in the same market by imposing on it a stricter legal duty than on its competitors.

Plaintiff relies on *Traex,* 846 F.2d at 1124, to support its contention that, as a matter of law, a prior infringer is placed under a greater duty than other competitors. That is not what the case stands for. Rather, *Traex* indicates that once a court has enjoined a party from utilizing an infringing trade dress, the court might be disinclined to expend scarce judicial resources in lengthy determinations of whether a new trade dress continues to infringe. The court can, in its discretion, require the infringer to utilize a new trade dress that does not even arguably infringe on the plaintiff's rather than taking the time to examine each proposal in detail.

In *Traex,* the defendant's trade dress had been found to infringe on that of the plaintiff. After the district court entered a broad permanent injunction, the defendant redesigned its trade dress so that it incorporated some, but not all, features of a different trade dress that the district court had previously found was easily distinguishable from that of the plaintiff. The court nonetheless held that the new trade dress violated its permanent injunction. On appeal this Court held that the defendant had an increased burden to emphasize the distinctions it made in its new design when asking the district court to approve it. Because the defendant had only presented the lower court with a "mockup" and a photograph, that court was within its discretion to examine them and conclude that the new design was "too close to the boundary line."

There is language in *Traex* to the effect that an infringer "[can] not assert that its new design should be accorded the same leniency that a good faith user might ask for," and that it has "an ongoing duty to select a trade dress which [will] avoid all possibility of confusion." 846 F.2d at 1124. This language addresses the evidentiary issue of how carefully a district court must scrutinize the new trade dress of a prior infringer, not, as plaintiff argues, the issue of

the infringer's legal duty to the first user. Accord *Scandia Down*, 772 F.2d at 1432 (After the district court had issued a preliminary injunction against the use of an infringing logo "or any colorable imitation thereof," and had disapproved two subsequent logos, it was not an abuse of discretion for it to hold that the fourth logo, which omitted many of the original's offending details, was nonetheless in violation of the injunction. "The court may require the contemnor to choose a distinctively different mark rather than to hew so close to the line that the parties must interminably return to court to haggle about every mark."); 3 McCarthy on Trademarks and Unfair Competition § 30.13[1] ("[Without the so-called safe distance rule] the enjoined defendant could simply make a tiny change and start a new trademark contest all over again in the context of the contempt hearing as to use of the 'new' format.").

We hold that while the district court would have been within its discretion to require Hersey to choose a trade dress that avoided all possibility of confusion, it was not required as a matter of law to do so. Thus the district court did not err by refusing to apply the "possibility of confusion" standard to the Hersey Series IIS, if in fact it refused to do so.[6]

Badger also contends that the district court premised its ruling that the Series IIS meter did not violate the permanent injunction on clearly erroneous findings of fact. Badger argues that the blue plastic collar Hersey placed around the sides of the Series II register only obscures its infringing trade dress. Plaintiff claims that because customers routinely disassemble meters to examine them, the infringing trade dress will become visible and will invite the inference that the Hersey Series IIS meter is a privately-labeled Badger meter. In response to this argument the court found, "Any user sophisticated enough to disassemble the meter and observe similarities in the internal parts is unlikely to be confused." R. 462 at 13. As plaintiff reminds us in its reply to defendants' cross-appeal, "the issue of likeli-

hood of confusion is 'all fact and no law.'" Pl. Reply Br. at 37, quoting *Scandia Down*, 772 F.2d at 1427–1428. We decline to disturb the district court's finding of fact in this regard.

Likewise, Badger is disturbed by Hersey's choice of blue for the plastic collar on the Series IIS meter, complaining that the blue is confusingly similar to "Badger blue," still used on Badger's packaging and catalogues, and used until 1985 on Badger Recordall meters. It argues that "Even if good faith competitors could use blue ... Hersey is a *guilty infringer* and is, therefore, 'disqualified to claim the full competitive rights which might be open to a stranger.'" Pl. Opening Contempt Br. at 20, quoting *Broderick & Bascom Rope Co. v. Manoff*, 41 F.2d 353, 354 (6th Cir.1930) (emphasis in original). As discussed above, the district court was not required as a matter of law to hold Hersey to a stricter standard than other competitors, although it had discretion to do so. It certainly did not make an erroneous finding of fact when it concluded that "The fact that the blue color is used doesn't create any likelihood of confusion. The Court recalls the plaintiff hasn't used its blue color since 1985." R. 462 at 13.

The district court will be affirmed on the plaintiff's second appeal.

## C. *Badger's Damages*

After the jury returned its special verdict finding in Badger's favor all of the elements of its claim of trade dress infringement Badger tried the issue of damages to the district judge. With some exceptions that are not relevant here, a plaintiff that prevails under 15 U.S.C. § 1125(a) is entitled to recover under 15 U.S.C. § 1117(a):

(1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action.... In assessing profits the plaintiff shall be required to prove defendant's sales only; defendant must prove all elements of cost or deduction claimed. In assessing damages the court may enter judgment, according to the circumstances of the case, for any sum above the amount found as actual damages, not exceeding

---

**6.** The judge below correctly quoted the *Traex* language and said he was applying it to the contempt motion. Plaintiff argues that this was just lip service and that the judge in fact applied the likelihood of confusion standard.

three times such amount. If the court shall find that the amount of recovery based on profits is either inadequate or excessive the court may in its discretion enter judgment for such sum as the court shall find to be just, according to the circumstances of the case. Such sum in either of the above circumstances shall constitute compensation and not a penalty.

Section 1117(a) provides a plaintiff with three methods for calculating its recovery. The first quoted sentence provides the standard method for determining the plaintiff's recovery, but the section also provides two additional methods if the standard method is inappropriate under the facts of the case.

 The standard method both allows the plaintiff to recover any damages it suffered on account of the infringement and also requires the defendant to disgorge any profits it gained from the infringement. In this manner the plaintiff is assured compensation for its losses and the defendant is also deprived of any benefit it unjustly reaped. *Web Printing Controls Co., Inc. v. Oxy–Dry Corp.,* 906 F.2d 1202, 1205 (7th Cir.1990); see also *Roulo,* 886 F.2d at 941 ("[defendants'] profits are awarded under different rationales including unjust enrichment, deterrence, and compensation") (citations omitted). The plaintiff's damages can include "loss of sales, profits, or present value (goodwill)." *Web Printing,* 906 F.2d at 1205. Items alleged as either unjust enrichment to the defendant or damages suffered by the plaintiff must, of course, have been caused by the infringement itself; in addition the amount must be provable, although some uncertainty in making this calculation is allowed. See, *e.g., id.; Otis Clapp & Son, Inc. v. Filmore Vitamin Co.,* 754 F.2d 738, 745 (7th Cir.1985).

 Because it is often difficult to demonstrate a causal connection between the defendant's infringement and the defendant's profits, and because plaintiffs' lost profits are notoriously difficult to prove, section 1117(a) provides two methods which the district court can utilize separately or in combination to approximate a fair recovery for the plaintiff. The first discretionary method is to award up to three times the damages plaintiff can actually prove. This of course requires that the plaintiff be able to prove some damages. Cf. *Otis Clapp,* 754 F.2d at 745. The second discretionary method allows the court to award the plaintiff "such sum as the court shall find to be just, according to the circumstances of the case," and is premised on the finding that "recovery based on [defendant's] profits is either inadequate or excessive." This method obviously does not require the plaintiff to prove that it suffered any damages on account of the infringement.

 Under this section any recovery to the plaintiff must constitute "compensation" for its own losses or for the defendant's unjust enrichment; section 1117(a) (unlike section 1117(b)) does not allow a "penalty" against the defendant. Under the first discretionary method the plaintiff's provable damages are the benchmark for determining whether an award constitutes compensation or whether it is a penalty. Under the second discretionary method the benchmark for making this determination is the likely benefit accruing to the defendant on account of its infringement.

 In this case Badger concedes that "As of the time of the trial Hersey had not derived any profits from its infringement conduct, and Badger did not offer evidence of specific lost sales attributable to the confusion created by the infringement." Pl. Opening Br. at 36. Plaintiff does not argue that it offered any other proof of damages. Badger therefore cannot recover anything but its costs under the standard method of calculating an award: Hersey derived no profits from its infringement and Badger suffered no provable damages. Nor can plaintiff avail itself of the first discretionary method of recovery discussed above, since that method is premised on the plaintiff proving some amount of damages. Badger is therefore limited to seeking a discretionary award on the ground that "the amount of recovery based on [defendants'] profits"—none—was inadequate.

In this context Badger encouraged the court to determine the amount of its recovery by considering Badger's own profit margins on the Recordall meters and the number of units of Hersey Series II meters sold, apparently inviting the judge to award in his dis-

cretion a sum based on Badger's approximation of its lost sales volume. This the judge declined to do, instead awarding no monetary damages at all. The court found that "any award requested by the plaintiff is not supported by the evidence but would, indeed, be a penalty in nature against the defendant." R. 327 at 9. Badger appeals on the ground that the judge erroneously applied precedent concerning the determination of actual damages to Badger's motion for a discretionary award.

We do not agree with Badger's interpretation of the court's analysis. The judge examined all of the ways he could calculate Badger's damages, and concluded that the statute provided no method whereby plaintiff could recover a monetary award. This was not error. First, the court determined that Badger could not recover under the standard method of calculating an award: Hersey had not derived any profit from its infringement, and Badger could not prove that it had suffered any damages. Second, the court determined that Badger could not recover under the first discretionary method of calculating an award because this method is premised on the plaintiff's proving some amount of actual damages. Finally the court turned to the second discretionary method of calculating an award, which is premised on unjust enrichment to the defendant, and in this context found that any award to Badger would constitute an impermissible penalty against Hersey. Although the judge's bench ruling is not as clear as it could be, we conclude that there was no error of law in determining plaintiff's recovery.

A discretionary award is just that—discretionary. The judge made no error of law in his analysis, and his refusal to enter such an award has not been shown to be an abuse of discretion. The district court will be affirmed on the issue of plaintiff's damages.

### D. Attorneys' Fees

The final sentence of 15 U.S.C. § 1117(a) provides that "The court in exceptional cases may award reasonable attorney fees to the prevailing party." "Exceptional cases" has been interpreted to mean cases where the acts of infringement can be characterized as malicious, fraudulent, deliberate, or willful.

See, e.g., Hairline Creations, Inc. v. Kefalas, 664 F.2d 652, 657–658 (7th Cir.1981). Badger sought the award of attorneys' fees on the ground that Hersey's infringement was deliberate and willful. It requested that the district court submit the issue of willfulness to the jury. Instead, the judge reserved the question of willfulness to the damages portion of the trial, when he found as a fact that Hersey's infringement was not willful. Badger appeals, arguing that it was an error of law not to submit the question of willfulness to the jury and that the judge's finding of fact was clearly erroneous.

■ Badger relies on Video Views, 925 F.2d at 1016, in support of its position that the issue of willfulness ought to have been submitted to the jury. Because Badger waived its right, if any, to have the jury determine the issue of willfulness we need not decide whether Video Views—which confers a right to a jury trial on the issue of willfulness in copyright cases under 17 U.S.C. § 504(c)(2)—also applies in the context of attorneys' fees for trade dress infringement under 15 U.S.C. § 1117(a).

On August 14, 1992, Badger submitted its revised special verdict form to the district court. That form submitted the issue of willful infringement to the jury. R. 285 at 1. It is clear that at the time Badger contemplated that the jury might determine its damages. Id. at 3. The trial commenced on August 17, 1992. That evening the judge distributed his proposed special verdict (R. 419 at 223), and the next day held a conference. At the August 18 conference Badger objected that the proposed special verdict did not include a question concerning willfulness and intent. R. 420 at 3. The judge replied that "in the event that [question] were to be asked, it would be asked in the second [damages] phase of the trial." Badger's counsel responded, "Thank you, Your Honor." That evening the judge informed counsel to be prepared to discuss the damages phase of the trial the next morning. R. 420 at 271. At the morning conference on August 19 the judge asked both counsel if there was any authority to try the damages phase to the jury. R. 424 at 4. Counsel for Badger explained that plaintiff sought a discretionary award. Id. at 5. The judge then quoted part of 15 U.S.C. § 1117(a), including the

sentence "the court in exceptional cases may award reasonable attorney fees to the prevailing party," and asked again whether there was any authority for the jury to make the award. R. 424 at 6. Counsel for Badger stated, "I share the Court's view in the observation of the law, and I don't contend that the jury has the authority. I think it is the Court." *Id.* The judge then informed the parties that after the liability phase of the trial was held to the jury, the jury would be discharged and the judge would hear the damage claims. *Id.*

At no point during this discussion did Badger object that the issue of willfulness should not be reserved for the damages phase, as contemplated by the court and counsel on August 18. Badger might have pointed out that at the August 18 conference it anticipated that damages were to be determined by the jury and that the jury, therefore, would be determining the issue of willfulness. It could have argued, although we express no opinion as to the merits of such an argument, that under *Video Views* the issue of willfulness should go to the jury even if damages are decided by the judge, and on that basis could have asked the judge to revisit the issue of the special verdict. Badger did none of these things. It cannot now argue that this Court should remand the case for a jury determination of willfulness on the ground that the judge erred in deciding that fact question himself at the damages phase.[7]

■ In addition to arguing that the judge below erred as a matter of law by not submitting the issue of willfulness to the jury Badger alternatively asks us to reverse the judge's factual determination on the ground that it is clearly erroneous. This we decline to do. Badger argues that Hersey clearly intended to copy its meter, and that this is sufficient to find willful infringement. We do not agree that intentionally copying a com-

petitor's product, even if this is later determined to involve trade dress infringement, by itself constitutes "willful" infringement, nor do cases from this Circuit support such a position.

Cases that award attorneys' fees under 15 U.S.C. § 1117(a) involve truly egregious, purposeful infringement, or other purposeful wrongdoing. In *Gorenstein Enterprises, Inc. v. Quality Care—USA, Inc.* the defendants, whose franchise had been terminated by the plaintiff, continued to use the plaintiff's trademark after they had lost on the merits of the trademark infringement action, on the ground that they were both permitted and required to continue using the plaintiff's trademark during the pendency of the defendants' own action to rescind the franchise. "So weak are [these arguments], and so deliberate the infringement, that it might have been an abuse of discretion for the district judge *not* to have awarded ... attorney's fees." 874 F.2d 431, 435 (emphasis in original) (noting that defendants actually were holding the trademark hostage in order to pressure the plaintiff to settle the suit or renegotiate the franchise). Likewise, in *Nu-Pulse, Inc. v. Schlueter Co.* the defendant had purchased parts to the plaintiff's milking equipment and combined those parts with substituted parts, identifying the hybrid as the plaintiff's product. The defendant "intended to put the plaintiff out of business" by this conduct. Such behavior was "malicious, fraudulent, deliberate, or willful," making this an exceptional case under 15 U.S.C. § 1117(a). 853 F.2d 545, 547 (7th Cir.1988). See also *Otis Clapp*, 754 F.2d at 746 (defendant's "cavalier disregard of the objective truth" in its false advertising targeted at plaintiff warranted a finding that its related trademark infringement was an exceptional case).

By contrast, cases that refuse to award attorneys' fees under 15 U.S.C. § 1117(a)

---

7. This Court recognizes that the Federal Rules of Civil Procedure require that once a party demands a jury trial no triable issues may be resolved by the district court without the consent of the parties. Fed.Rules Civ.Proc. 38(d). Rule 39(a)(1) provides mechanisms for the granting of such consent, but this Circuit has never required strict compliance with Rules 38 and 39 to effect a waiver of a jury demand. See, *e.g., Reboy v. Cozzi Iron & Metal, Inc.*, 9 F.3d 1303, at 1305. A party's conduct at trial may effectively waive its right to a jury trial. *Id.* In this case it was clear on August 19 that the judge intended to make the willfulness determination himself, and Badger did not object. Under the circumstances Badger's conduct on August 19 constituted waiver of its right, if any, to have the issue of willfulness decided by the jury. Accord *Lovelace v. Dall*, 820 F.2d 223, 227 (7th Cir.1987).

might involve deliberate copying of a competitor's product, but do not involve purposeful infringement of the competitor's trademark or trade dress. In *Roulo* the defendant was found to have deliberately imitated the plaintiff's greeting cards, including the cards' trade dress. Nonetheless the plaintiff was not entitled to recover her attorneys' fees because the defendant made "conscious efforts to create elements of dissimilarity, although the dissimilarities were not sufficient" to avoid liability for trade dress infringement. 886 F.2d at 942. In *Traex* the district court was correct not to have awarded attorneys' fees in the case in chief because, although defendant had deliberately copied plaintiff's product, it was a close call whether that copying constituted trade dress infringement: "[T]he question of functionality was close enough to remove it from the ambit of an 'exceptional' case." 846 F.2d at 1125.

In this case it is clear that Hersey purposely copied Badger's water meter. Much of this copying was well within Hersey's rights as a competitor; some was not. We agree with the district court that "Although it could be inferred from the evidence that defendants copied Badger's meter in an effort to copy its functional characteristics ... [t]he admittedly legal process of copying unpatented functional meter characteristics does not support a finding that the case is exceptional." That Hersey deliberately copied Badger's meter does not entail that Hersey deliberately infringed on Badger's trade dress. In this case, as in *Traex*, "the question of functionality was close enough to remove [the case] from the ambit of an 'exceptional' case." 846 F.2d at 1125.

### Conclusion

Hersey's cross-appeal, which argues that there was insufficient evidence as a matter of law for a reasonable jury to find a likelihood of consumer confusion as to the source of the two water meters, goes more to the weight than to the sufficiency of the evidence. Therefore we affirm the district court's denial of Hersey's motion for judgment notwithstanding the verdict. Badger's appeals con-

---

\* Pursuant to Fed.R.App.P. 43(c)(1), Robert B. Reich has been substituted for his predecessor as

cerning the district court's injunction fail because the district court was not obliged to hold Hersey to the higher standard proposed by plaintiff, and it in no way made clearly erroneous findings of fact with regard to the injunction. Likewise the district court did not err as a matter of law in determining Badger's damages nor did the judge abuse his discretion. Finally, Badger waived its legal argument that the jury ought to have determined the issue of willfulness in connection with its motion for attorneys' fees, and fails to persuade us that the district court's findings of fact in that regard were clearly erroneous.

For the foregoing reasons the district court is affirmed in all respects.