# In the

# United States Court of Appeals

## For the Seventh Circuit

_____

No. 03-4085

TE-TA-MA TRUTH FOUNDATION-FAMILY OF URI, INC.,

*Plaintiff-Appellant*,

v.

THE WORLD CHURCH OF THE CREATOR,

*Defendant-Appellee.*

_____

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 00 C 2638—**Joan Humphrey Lefkow**, *Judge.*

_____

ARGUED SEPTEMBER 8, 2004—DECIDED DECEMBER 13, 2004

_____

Before BAUER, MANION, and KANNE, *Circuit Judges.*

KANNE, *Circuit Judge.* TE-TA-MA Truth Foundation-Family of URI, Inc. ("the Foundation") sued the World Church of the Creator ("the World Church"), alleging, among other things, trademark infringement in violation of the Lanham Act, 15 U.S.C. §§ 1051 *et seq.* The district court granted summary judgment in the World Church's favor, and the Foundation appealed. We reversed the judgment of the district court and remanded with instructions to enter an appropriate judgment in favor of the Foundation. *TE-TA-MA*

*Truth Foundation-Family of Uri, Inc. v. World Church of the Creator*, 297 F.3d 662 (7th Cir. 2002) (hereinafter *Foundation I*). Following entry of judgment in its favor, the Foundation moved for an award of attorneys' fees pursuant to 15 U.S.C. § 1117(a), which allows a court to award reasonable attorneys' fees to the prevailing party if the case is "exceptional." The district court denied the Foundation's motion because the Foundation had not shown willful infringement on the World Church's part. Because we find this case exceptional, we reverse the judgment of the district court and remand for further proceedings consistent with this opinion.

## I.  Background

In our previous opinion, *Foundation I*, 297 F.3d at 662, we recounted the facts giving rise to the Foundation's Lanham Act trademark claims, and we need not repeat them here. Instead, we focus on the egregious conduct of the World Church and its followers, as documented extensively in the record, throughout the course of the litigation below. We recount these facts in some detail because the nature of the World Church's litigation conduct is central to the Foundation's argument on appeal.

The Foundation and the World Church are organizations with diametrically opposing views, to put it mildly. The Foundation, a recognized religious charity, practices as a central tenet the promotion of universal love and respect.[1]

---

[1]  The Foundation's Sacred Mandate reads in part:

CHURCH OF THE CREATOR®

Supports The Family Unification Of Mankind In All

Aspects Of The Whole.

(continued...)

Like many other religious organizations, the Foundation provides a range of spiritual services, including: classes, lectures, and seminars on religion and self-help; ministerial services; religious consulting; ordination services; and religious, spiritual, and educational information via the internet. The Foundation provides these services and others in connection with the name "CHURCH OF THE CRE-ATOR®." The Foundation began using the name sometime in 1982 and subsequently registered the name with the U.S. Patent and Trademark Office in 1987.

In contrast to the Foundation, the World Church subscribes to far less harmonious principles. The World Church is a nonprofit organization with goals succinctly described in its slogan: "Dedicated to the Survival, Expansion, and Advancement of the White Race." The World Church's goal is the elimination of Jews, blacks, and so-called "mud races." The organization first began operating under the name "Church of the Creator" upon its founding in 1973 and changed its name to "World Church of the Creator" at some point in the 1990s. The World Church registered neither name with the U.S. Patent and Trademark Office. Although styling itself a "church," the World Church has had its tax-exempt charity status revoked by both state and federal governments. *See*, *e.g.*, *Church of the Creator, Inc. v. CIR*,

---

[1]  (...continued)
We of Like Mind Join Harmoniously In Oneness,

Knowing That There Is Only One

Creator-Source.

The Many In One Dedicate Our Physical

Embodiments To The God Expression In

Form, Bringing Forth By Example To This Planet

Earth Love, Light and Peace.

707 F.2d 491 (11th Cir. 1983); *Illinois v. World Church of the Creator*, 760 N.E.2d 953 (2001).

Thus, from at least 1987, the Foundation operated under its registered mark "CHURCH OF THE CREATOR®" at the same time that the World Church conducted its own affairs under the moniker "World Church of the Creator." During this period, the World Church, under the leadership of Matthew Hale, engaged in or was associated with a number of incidents that heightened public awareness of the World Church's particular brand of "religion." For example, in 1997, Hale and other World Church members ("Creators") made an appearance on the nationally televised *Jerry Springer Show*, in which they proclaimed hatred for racial minorities, Jews, and even Christians. More notorious publicity came in 1998, when Benjamin Smith, a World Church devotee, embarked on a multistate shooting spree in which he targeted minorities. Smith shot and killed two victims and wounded several others before he took his own life. *See, e.g.*, Russell Working, *Rampage Left Lasting Wounds*, CHI. TRIB., July 4, 2004, at 10. Activities of this sort served to focus the public spotlight in a negative way on the beliefs of the World Church's members and leaders.

Given the confusing similarity in the names of the two organizations, it was certainly possible that the Foundation might be mistaken for the unsavory organization headed by Hale, and that is precisely what happened. The Foundation began to receive angry complaints and denunciations from parties believing that the CHURCH OF THE CREATOR® and the World Church of the Creator were the same entity, or that the Foundation endorsed the World Church's racist creed. As a result, on May 2, 2000, the Foundation filed suit against the World Church to enjoin its use of the obviously confusing name "World Church of the Creator" and for other relief.

## A. Initial Harassment by World Church Members

Shortly after filing suit, the Foundation began receiving email and voicemail messages from World Church followers. A number of the communications were merely rude or offensive, but others took a more threatening tone (all grammar, usage, and spelling in original):

！ "Perhaps I will drop by and pay you a visit. TOM METZGER"[2]

！ "Race Traitors, We will include you in the concentration camps next time around, so you can be with the jews you so love."

！ "if you are wise you will stop such a stupid action as a lawsuite, for your well-being."

！ "i and my racial comrades take a great offense in suing the real church of the creator . . . . you wander why Hitler took you Jewish scum out back then well i hope you realize this will piss my race off even more because of this there may be a rise in so called 'Hate Crimes' i am not saying i am going to but your sure to piss somebody off to the point of violence . . . HIEL HITLER, HIEL KLASSEN, HIEL ROCKWELL . . . WHITE POWER"

！ "I'll tell you what your going to do is piss off allot of my aryan brothers and sisters!"

！ "You sick, filthy, degenerate assholes! Burn in Hell!"

！ "YOU HAVE NO RIGHT TO THE WORD CREATOR . . . . TAKE PRIDE IN YOUR RACIAL

---

[2] One Tom Metzger is the director of the White Aryan Resistance, a militant white supremacist group, although it is unclear whether the sender of this email is the same person.

HERITAGE BEFORE YOUR CHILDREN ARE
SMOTHERED BY MIXED MUTTS"

！ "I'm a member of a white racel racial religion called
creativity. Are church is called the world church of the
creator. . . . What makes you think that we stould the
name from you FUCKING KIKE?"

The Foundation continued to receive messages of this sort
throughout the initial stages of litigation in the district
court. Eventually, the Foundation and the World Church
filed cross-motions for summary judgment. On January 31,
2002, the district court granted summary judgment in the
World Church's favor. *See TE-TA-MA Truth Foundation-
Family of URI, Inc. v. World Church of the Creator*, No. 00
C 2638, 2002 WL 126103, 2002 U.S. Dist. LEXIS 1478 (N.D.
Ill. Jan. 31, 2002). The Foundation appealed the judgment
on February 12, 2002.

## B.  Harassment During the Pendency of the Appeal

The threats and harassment continued unabated after the
Foundation filed its notice of appeal. Indeed, if anything, it
seems that the harassment became progressively worse and
expanded to include the Foundation's attorneys. Hale now
exhorted World Church members via email to "put pressure
to bear on the [Foundation's] scoundrel law firm [Kirkland
& Ellis] that is pushing this frivolous and malicious lawsuit
against us." Hale also provided the names and phone
numbers of two of the Foundation's lead attorneys, labeling
one a "definite Jew" and the other a "probable Jew." Hale
reminded the email recipients that "these scoundrels have
brought this suit to consume our time and resources.
Perhaps their time and resources will be consumed as well."

Hale also posted several "hotline" messages on the World
Church's website, in which he again noted his belief that
the Foundation's lead attorneys "are Jewish," and he pro-

vided their phone and facsimile numbers so that World Church members could "protest this witch hunt and make [the Foundation's attorneys] consume their time and money dealing with the mass of calls from angry White Racial Loyalists." Moreover, Hale reminded members that the Foundation's attorneys, who work at a "Jew infested law firm," had "consumed enough of our time and money—perhaps they could be repaid in kind." Hale asked members to "continue calling Kirkland & Ellis and voice your opposition to their pursuing this appeal of their harassment lawsuit against us."

In response to Hale's exhortations, World Church members and sympathizers continued their barrage of emails and phone calls to the Foundation's counsel. A sampling of these communications follows (all grammar, usage, and spelling in original):

! "I urge you to rescind from carrying this case on any further to avoid embarrassment to yourself and to your clients."

! "I understand that your law firm has appealed a decision handed down by a lower court in the World Church Of The Creator name lawsuit. . . . I'm a member of WCOTC and I just want to say that I think it's awful that your firm would do this kind of cheap, petty thing in the first place. WE had the name first. No one else did and it's been proven. Why do you and your firm place money ahead of ethics and morals? Obviously your client is paying a lot of money. Shame on your firm. God is watching you."

! "Listen up you Kike, you better leave our fuckin' church alone or I'm gonna fuckin' kill you."

### C. Harassment Following the Disposition of the Foundation's Appeal

In July 2002, we reversed the judgment of the district court and remanded with instructions that judgment be entered in the Foundation's favor. *Foundation I*, 279 F.3d at 662. Undeterred by this setback, the World Church issued another hotline message on its website within days of our decision. In essence, the hotline made it clear that the World Church intended to ignore any "federal decision" and proclaimed that "[t]here is no power, there is no authority that can tell us, as a Church, that we must use a certain name to celebrate our beloved White People. . . . Our teachings will not be changed or altered to meet the prejudices of a Federal Judge." The hotline also called for World Church members to continue using the infringing name wherever possible.

On August 1, 2002, Hale sent a mass email to World Church members in which he proclaimed: "We have called upon [sic] protests before against these vermin [the Foundation and its attorneys] and these protests have at least had the result of rattling them." Hale noted the apparent success of these efforts, which resulted in "the Jew lead attorney James Amend call[ing] [the World Church's] attorney whining . . . about his phone line being jammed with angry Creators."

Apparently not content with their accomplishments to date, Hale stressed to World Church members that the harassment campaign "must now become deafening as a means to make clear the resolve of our Church and its adherents." Hale again provided phone numbers and addresses for the Foundation itself and its attorneys, and he asked that members "ask to speak to any of these scoundrels and spend as much time as you desire taking them away from their mission of destroying our identity and religious liberty."

Responding to Hale's call, a large number of World Church members or sympathizers sent a barrage of new email and voicemail messages to both the Foundation and its attorneys. As before, some messages were merely offensive or rude, but others were of a more threatening nature (again, all grammar, usage, and spelling in original):

！ "The World Church of the creator has members in your area and who are on their way to talk to you about the lawsuit."

！ "do us, the people concerned about the preservation of natures finest, a favor. I'm sure we could supply you with the gun."

！ "The only thing you will be successful in doing is EARNING THE WRATH OF THOUSANDS OF CREATORS!"

！ "The World Church of the Creator has had our name for many years more than you. . . . you will make a lot of people very angry."

！ "My name is Michael and I am a member of the WCOTC in East Peoria. I think it is absurd that a organization such as yourself . . . would battle for a name instead of allowing us to have the name our founder gave us."

！ "You must STOP you FASCIST ATTACK on our Church!! Protests and Boycotts are all you will get from us!!!!"

！ "keep praying to your pathetic jew god that does not exist that you and all your 'brothers of humanity' will not suffer the same fate that you are destined to face"

！ "They that can give up essential liberty to obtain a little temporary safety deserve neither liberty nor safety."

!  (voicemail) "Yes, my name is John Pierce. I'm a member of the COTC, the Church of the Creator, the real Church of the Creator. Personally, I think you're a shyster, the ambulance chaser of the worse kind. How dare you persecute the Church of the Creator?"

!  (voicemail) "Yeah, I'm a member . . . of the WCOTC, the real COTC, and I must say that I find your actions extremely offensive . . . . we don't care what that three judge court of clowns say, we have the right to our religion . . . . We will not abide by any of the unconstitutional proclamations of your kangaroo court. To hell with you."

!  "You can pay all the judges you want, hire all the expensive lawyers you want, pass all the crooked laws you want prohibiting us from using our name but none of it will work we will keep the name that our founder Ben Klassen gave us in 1972. No matter what!!!!"

!  (voicemail) "We will not abide by your distortions, your perversion of the Constitution."

### D.  Harassment Following Remand

In the meantime, following our decision reversing the district court, the Foundation filed a motion for a permanent injunction and a motion to declare the case exceptional and for award of attorneys' fees under 15 U.S.C. § 1117(a). In support of the latter motion, the Foundation argued that the onslaught of harassing communications from World Church members made the case exceptional in the way that we have previously described such cases under § 1117(a)— those involving "truly egregious, purposeful infringement, or other purposeful wrongdoing." *Badger Meter, Inc. v. Grinnell Corp.*, 13 F.3d 1145, 1159 (7th Cir. 1994).

On August 28, 2002, almost immediately on the heels of the Foundation's motion for attorneys' fees, the World

Church issued a "press release" on its website that again included phone numbers for the Foundation's counsel and directing members to "call the Jews of Kirkland & Ellis, James Amend and Paul Steadman, and challenge them."

On November 19, 2002, the district court issued an order and injunction complying with our remand, but issued no ruling on the Foundation's motion for attorneys' fees. Shortly thereafter, on December 4, 2002, the World Church posted yet another press release on its website responding to the district court's order and injunction. A sampling of the language contained in the press release follows:

> ! "A federal judge has no constitutional power to either rewrite our religion or order the destruction of our religious books"

> ! "I [Matt Hale] neither have the power nor the desire to change our religion to meet the dictates of a corrupt judge"

> ! "We call upon Judge Lefkow [the presiding district court judge] to recognize that her alleged order violates the supreme law of the land"

> ! "By your actions, Judge Lefkow, you have made your-self part of the criminal conspiracy to destroy rights"

> ! "[W]e have the right to declare them as open crimi-nals violating the Constitution and the highest law of the land. They then obviously are the criminals, and we can treat them like the criminal dogs they are and take the law into our own hands. This is the obvious, logical thing to do. We must meet force with force and open warfare exists. It will then be open season on all Jews"

> ! "This court order places our Church in a state of war with this federal judge and any acting on authority from her kangaroo court"

In addition, as indicated on a white supremacist website on December 6, 2002, the World Church apparently began taking steps to flout the district court's order and injunction:

> The World Church of the Creator today publically [sic] violated a federal judge's court order to destroy their "Holy Books" by shipping their remaining stock of said books out of the state of Illinois and the jurisdiction of the local Federal Appeals Court.
>
> ***
>
> According to an email sent out today by Matt Hale, the books have been shipped to another US state. While such a transfer of property is a violation of the court's order, it does place the property out of the court's power for the moment . . . .

In the above-referenced email, Hale vowed that he was "planning many surprises for our enemies both inside and outside the courtroom."

On December 13, 2002, the district court issued an order to show cause why the World Church should not be held in contempt given the World Church's admitted efforts to avoid compliance with the express terms of the injunction. Following this order, the World Church filed a series of motions, including motions to disqualify the presiding district court judge as well as the Foundation's counsel; the district court denied these motions.

In the meantime, however, Hale apparently had undertaken to follow through on his vow to plan "many surprises" for persons the World Church considered enemies. On January 8, 2003, federal agents arrested Hale on a two-count indictment for soliciting the murder of Judge Lefkow and for attempting to influence the judge corruptly and by force. *See United States v. Hale*, No. 03 CR 0011 (N.D. Ill.

Jan. 7, 2003). A jury subsequently convicted Hale on four of the five counts with which he was eventually charged.[3] *See United States v. Hale*, No. 03 CR 0011 (N.D. Ill. Apr. 26, 2004).

---

[3] Hale's criminal prosecution is not at issue in this appeal, but the Foundation contends that Hale's actions in connection with his criminal prosecution constituted part of the World Church's vexatious litigation conduct, which *is* at issue. It does appear that certain of Hale's actions giving rise to his criminal case mesh with the general pattern of litigation misconduct in the trademark case. For example, the Foundation notes that during Hale's criminal trial, the government offered evidence of emails in which Hale urged World Church followers to "take matters into their own hands" following the district court's entry of the order and injunction in the Foundation's favor. Hale referred to the district judge and "any acting on authority from her kangaroo court" as "criminals" that the World Church "can treat . . . like the criminal dogs they are and take the law into our own hands. This is the obvious, logical thing to do. We must then meet force with force and open warfare exists."

The government also offered evidence that Hale ordered the head of the "White Berets" (the World Church's security arm) to find the home addresses of the district court judge and three of the Foundation's attorneys. In a taped conversation, the White Beret asked Hale if the plan was to "exterminate the rat," referring to the district court judge. Hale responded that the White Beret should do "whatever [he] want[s] to do, basically." When the White Beret told Hale to "consider it done," Hale responded, "Good." In another taped conversation, the White Beret reported to Hale that plans were in place to "exterminate" the judge, to which Hale replied that he could not be part of such a plan, but if the conversation ever came up later, the White Beret should say that the two had been discussing baseball, a topic that never surfaced during the taped conversation.

## II. The District Court's Denial of the Foundation's Motion for Attorneys' Fees

On March 31, 2003, while Hale's criminal proceedings progressed separately before a different judge, the district court issued its order denying the Foundation's motion to declare the case exceptional and award attorneys' fees. *See TE-TA-MA Truth Foundation-Family of URI, Inc. v. The World Church of the Creator*, No. 00 C 2638, 2003 WL 1720000 (N.D. Ill. Mar. 31, 2003) (hereinafter *Foundation II*). The district court specifically found that the World Church had sent a "barrage of hateful letters, voice- and e-mails to the Foundation and the Foundation's counsel." *Id.* at *1. The district court also found that "[a]s the [evidence] demonstrates, more than 70 communications were sent, and they can be readily traced to incitement by Hale, who via e-mail called upon World Church members to 'make [the Foundation and its attorneys] consume their time and money dealing with the mass of calls from angry White Racial Loyalists' and to pressure the Foundation to drop the law suit." *Id.* The district court concluded that these communications were "ugly, even threatening," and described the World Church's conduct as "reprehensible" and "tortious or criminal." *Id.* at *1, *2 n.2.

Nevertheless, the district court denied the Foundation's motion due to its interpretation of the reach of § 1117(a). The district court cited our decisions in which a trademark plaintiff was vindicated on the merits and the case subsequently was declared exceptional because "the acts of infringement [could] be characterized as malicious, fraudulent, deliberate, or willful." *Id.* at *1 (citing *Otis Clapp & Son, Inc. v. Filmore Vitamin Co.*, 754 F.2d 738, 746 (7th Cir. 1985)). The district court interpreted these prior decisions as requiring the prevailing plaintiff in a trademark case to show willful infringement on the part of the infringer before the case may be declared exceptional and attorneys' fees awarded under § 1117(a). *See Foundation II* at *1-2.

The district court noted that the Foundation's motion for fees was founded not on any allegation of willful infringement, but instead on its contention that the World Church's litigation conduct was in bad faith or for the purpose of harassment. *See id.* at \*1. The Foundation supported its motion with citation to authority from the Third Circuit allowing a finding of exceptionality and awarding attorneys' fees to the prevailing plaintiff where the accused infringer engaged in litigation misconduct. *See id.* at \*2 (citing *Securacomm Consulting, Inc. v. Securacom, Inc.*, 224 F.3d 273 (3d Cir. 2000)). The district court declined, however, to extend to the Foundation's case the broader view espoused by the Third Circuit, even though the district court acknowledged that "[t]he case before [it was] more like *Securacomm Consulting* than any case cited from the Seventh Circuit." *Foundation II* at \*2. Instead, the district court concluded that *Securacomm Consulting* "stands alone" in awarding fees for bad faith defense litigation conduct and that authority from this and other circuits indicates that the circumstances of the case did "not lend themselves to the fee shifting provisions of the Lanham Act." *Id.* Accordingly, because the Foundation had not demonstrated willful infringement on the part of the World Church, the district court declined to declare the case exceptional and denied the Foundation's motion. *See id.*

Nevertheless, on May 1, 2003, the district court found the World Church in contempt of its injunction for "affirmatively and knowingly flout[ing]" the "express terms" of the injunction and levied sanctions against it. Thereafter, on October 27, 2003, the district court entered a final judgment in the Foundation's favor, ruling that the World Church and its member-leaders were in contempt of the district court's order and injunction and were jointly and severally liable to the Foundation for $200,000 in sanctions and $1132 in costs. The

Foundation appealed the district court's denial of the motion for award of attorneys' fees.[4]

## III. Analysis

### A. The Foundation's Arguments on Appeal

The Foundation argues that the district court erred when it concluded that the case was not exceptional. The Foundation believes that the district court's conclusion was erroneous because its interpretation of § 1117(a) precludes a finding of exceptionality and award of fees to a prevailing plaintiff without willful infringement by the defendant. The Foundation posits that there is no such limitation and that the statute and our caselaw allow sufficiently egregious litigation misconduct to serve as the basis for an exceptional case and award of fees to a prevailing plaintiff.

Consequently, the Foundation urges that the World Church's actions in the case justify an award of fees because its campaign of harassment went "well beyond the pale of acceptable litigation conduct" and because it flagrantly disregarded the district court's order and injunction. The Foundation argues that the World Church's harassment was part of its strategy to "put pressure to bear" on the Foundation's attorneys in order to consume their "time and money," and the Foundation asserts that it in fact expended time and money responding to the harassment. Thus, the Foundation contends that the World Church's behavior amounts to litigation misconduct that is so egregious that it may serve as the basis for attorneys' fees under § 1117(a).

---

[4] The World Church did not file a brief in opposition to the Foundation's appeal and did not appear at oral argument. Consequently, we decide this appeal without the benefit of any briefing or argument on the World Church's behalf.

The decision to award fees under § 1117(a) is within the district court's sound discretion. *See BASF Corp. v. Old World Trading Co.*, 41 F.3d 1081, 1099 (7th Cir. 1994) ("A decision to award attorneys' fees under the Lanham Act is firmly committed to the district court's discretion."). We normally review for abuse of discretion a district court's denial of fees under § 1117(a). *See Otis Clapp & Son*, 754 F.2d at 747. In this case, however, the district court denied fees on the basis of its interpretation of the scope and meaning of § 1117(a), so we apply *de novo* review. *See Badger Meter*, 13 F.3d at 1154-55 ("We review the district court's conclusions of law *de novo*."); *accord Securacomm*, 224 F.3d at 279 ("[O]ur review of the scope and meaning of 'exceptional' . . . is plenary. . . .").

### B. Fee-Shifting Under § 1117(a) and the Standard for Prevailing Plaintiffs

Resolution of this appeal requires us to answer two fundamental questions. Does § 1117(a) require a prevailing plaintiff to show willful or other culpable infringement, and if not, does a defendant's litigation misconduct properly serve as a basis for attorneys' fees? For answers, we look first to the language of § 1117(a).

Section 35 of the Lanham Act allows fee-shifting under limited circumstances—specifically, the final sentence of § 1117(a) provides that a "court in exceptional cases may award reasonable attorney fees to the prevailing party." 15 U.S.C. § 1117(a). The statute does not define "exceptional case," however. We previously have determined exceptional cases to be those involving some measure of culpability on the part of the losing party—for example, in "cases where the acts of infringement can be characterized as malicious, fraudulent, deliberate, or willful." *Badger Meter*, 13 F.3d at 1158 (citing *Hairline Creations, Inc. v. Kefalas*, 664 F.2d 652, 657-58 (7th Cir. 1981)); *see Gorenstein Enters., Inc. v. Quality Care-USA, Inc.*, 874 F.2d 431, 436 (7th Cir. 1989) (collecting authority). Indeed,

we have described the latter standard as a "canonical formula" that we and the other circuits apply when determining whether a case is exceptional and award of fees warranted. *See Door Sys., Inc. v. Pro-Line Door Sys., Inc.*, 126 F.3d 1028, 1031 (7th Cir. 1997) (collecting authority). This standard could seem to foreclose a prevailing plaintiff from recovering fees without culpable infringement by the defendant, and this is how the district court interpreted § 1117(a) and pertinent caselaw. Yet § 1117(a) says nothing about treating the prevailing party differently depending on its status as plaintiff or defendant.

Until now, we have not squarely confronted the question whether, pursuant to § 1117(a), a trademark defendant's litigation conduct, as opposed to its willful infringement, could make the case exceptional and justify the award of fees to a prevailing plaintiff. We have held, however, that a plaintiff's litigation conduct may justify an award of fees to a prevailing defendant. For example, in *Door Systems*, we concluded that the appropriate inquiry when the defendant is the prevailing party is whether the plaintiff's suit is oppressive. *See id.* at 1032 ("[B]etween good faith as a safe harbor and deliberateness as an automatic basis for award-ing fees is the category of oppressive suits, fairly described as exceptional, in which the case for an award of fees to the defendant is compelling."). We have clarified that a suit may be oppressive "if it lacked merit, had elements of an abuse of process claim, and [the] plaintiff's conduct unreasonably increased the cost of defending against the suit." *S Indus., Inc. v. Centra 2000, Inc.*, 249 F.3d 625, 627 (7th Cir. 2001); *accord Nat'l Ass'n of Prof'l Baseball Leagues, Inc. v. Very Minor Leagues, Inc.*, 223 F.3d 1143, 1147 (10th Cir. 2000) ("No one factor is determinative, and an infringement suit could be 'exceptional' for a prevailing defendant because of . . . the unusually vexatious and oppressive manner in which it is prosecuted. . . ."). In short, we have concluded that a case may be exceptional if a losing plaintiff's liti-

gation conduct is particularly egregious. *See S Industries*, 249 F.3d at 627-28 (plaintiff's litigation conduct was oppressive and fees appropriate where plaintiff engaged in such dilatory tactics and antics as: not responding to discovery requests, repeatedly failing to serve properly or sign motions, failing to satisfy local rules provisions, ignoring filing deadlines, submitting motions late or not at all, missing scheduled hearings, and otherwise engaging in tactics resulting in an extra nine months of delay and added costs to defendant); *accord Aromatique, Inc. v. Gold Seal, Inc.*, 28 F.3d 863, 877 (8th Cir. 1994) ("Courts have defined the characteristics of exceptional cases with adjectives suggesting egregious conduct by a party.").

### 1. Possible "Dual Standard" Under § 1117(a)

These cases seem to treat prevailing plaintiffs and defendants differently with regard to fee-shifting under § 1117(a). On one hand, a prevailing plaintiff must show culpability with respect to the defendant's infringement, while on the other hand, a prevailing defendant must show that the plaintiff's litigation conduct was oppressive. *See Door Systems*, 126 F.3d at 1032 ("The circumstances that are exceptional when the infringer is being asked to pay the victim's attorneys' fees need not be exceptional when the shoe is on the other foot."); *accord Very Minor Leagues*, 223 F.3d at 1148 & n.4 ("When attorney fees are awarded against a defendant, the court looks to whether the defendant's *acts of infringement* were pursued in bad faith. When attorney fees are awarded against a plaintiff, the court looks to the plaintiff's conduct *in bringing the lawsuit and the manner in which it is prosecuted*.") (emphasis in original).

Such a dual standard likely runs afoul of the party-neutral approach dictated by the Supreme Court in *Fogerty v. Fantasy, Inc.*, 510 U.S. 517 (1994). In *Fogerty*, the Court considered whether prevailing plaintiffs and prevailing defendants

must be treated alike with respect to fee-shifting under the Copyright Act, 17 U.S.C. § 505, which provides that "the court may also award a reasonable attorney's fee to the prevailing party as part of the costs." Some circuits, including this one, favored an approach in which fees would be awarded according to different standards for prevailing plaintiffs and prevailing defendants. *See Fogerty*, 510 U.S. at 521 n.8 (citing cases from the Second, Seventh, and D.C. Circuits). Other circuits applied an evenhanded approach with respect to plaintiffs and defendants. *See id.* (citing cases from the Fourth and Eleventh Circuits). The Court considered and rejected the arguments that a dual standard should apply and concluded that the evenhanded approach should guide fee-shifting under the Copyright Act. *See id.* at 534. In so doing, the Court also concluded that "federal fee-shifting statutes in the patent and trademark fields, which are more closely related to that of copyright, support a *party neutral approach.* Those statutes contain language similar to that of § 505, with the added proviso that fees are only to be awarded in 'exceptional cases.'" *Id.* at 525 n.12 (emphasis added).

Thus, in *Fogerty*, the Court indicated approval, consistent with the standard applicable in Copyright Act cases, for an evenhanded approach to fee-shifting in trademark cases, and we and other circuits have acknowledged this interpretation of *Fogerty*. *See FASA Corp. v. Playmates Toys, Inc.*, 108 F.3d 140, 143 (7th Cir. 1997); *accord Securacomm Consulting*, 224 F.3d at 280 n.1; *Stephen W. Boney, Inc. v. Boney Servs., Inc.*, 127 F.3d 821, 827 (9th Cir. 1997) (citing *FASA Corp.* and concluding that, after *Fogerty*, "the standard . . . under which bad faith or other malicious conduct satisfies the exceptional circumstances requirement[ ] applies to both prevailing plaintiffs and prevailing defendants seeking attorney's fees under the Lanham Act.").

### 2.  The Party-Neutral Approach

Closer analysis of our § 1117(a) cases does not lead us to the conclusion that we have been applying a dual standard that runs contrary to the Supreme Court's party-neutral analysis in *Fogerty*. The Foundation points out that our caselaw interpreting the statute does not foreclose finding a case exceptional and awarding fees to the prevailing plaintiff for reasons other than culpable infringement. In *Badger Meter*, for example, we defined exceptional cases under the statute as those involving "truly egregious, purposeful infringement, *or other purposeful wrongdoing.*" 13 F.3d at 1159 (emphasis added). Thus, we have recognized that wrongdoing beyond culpable infringement may justify declaring a case exceptional and awarding fees to a prevailing plaintiff. This interpretation does not conflict with our application of the aforementioned canonical formula, but instead clarifies that our interpretation of § 1117(a) does not limit exceptional cases *only* to those in which the prevailing plaintiff shows willful infringement on the defendant's part.

Other relevant caselaw is not to the contrary, and we believe the district court read this authority too narrowly. For example, the district court cited *Otis Clapp & Son* to support its conclusion that exceptional cases "are ones in which the acts of infringement can be characterized as malicious, fraudulent, deliberate, or willful." *See Foundation II*, 2003 WL 1720000, at *1 (citing 754 F.2d at 746). But in *Otis Clapp & Son*, we also recognized that "Section 1117 confers a wide scope of discretion on the district court in fashioning a remedy for a trademark infringement subject to the principles of equity." 754 F.2d at 746 (citations omitted). Moreover, the language cited by the district court describes the types of culpable infringement that justify fees, but does not restrict a prevailing plaintiff's recovery of fees *only* to instances in which such culpability is found. Nowhere did

we interpret the § 1117(a)'s "broad principles of equity" as extending no further than culpable infringement.

The district court also cited for support our decision in *Roulo v. Russ Berrie & Co.*, 886 F.2d 931 (7th Cir. 1989). *See Foundation II* at *1 ("The Seventh Circuit interprets this provision 'to require a finding of wilful infringement.'") (citing *Roulo*, 886 F.2d at 943). The quoted passage from *Roulo*, however, cites *Hairline Creations*, in which we noted that Congress intended the fee-shifting provision of § 1117(a) to "track[ ] the parallel [fee-shifting] provisions of the patent and copyright statutes." 664 F.2d at 657. This observation further supports *Fogerty*'s apparent approval for a party-neutral standard for fee-shifting under § 1117(a), and it is evident that a standard requiring a prevailing plaintiff to show willful or other culpable infringement, but allowing a prevailing defendant to recover based on the plaintiff's conduct, is inconsistent with a party-neutral approach for the reasons already discussed.

Moreover, *Hairline Creations* quotes the language from the legislative history of § 1117(a) that gave rise to the so-called canonical formula, which allows fees where infringement can be characterized as malicious, fraudulent, deliberate, or willful. *See* 664 F.2d at 657-58 (citation omitted). The legislative history does not explicitly state that a prevailing plaintiff can recover fees *only* if the defendant willfully infringed. Instead, this language (and similar language in our other cases) suggests that to the extent a prevailing plaintiff seeks fees pursuant to § 1117(a) for the defendant's infringing use, such infringement must be culpable.

Further review of the legislative history indicates that Congress did not intend fee-shifting under § 1117(a) to turn only on whether a prevailing plaintiff can show culpable infringement. Rather, Congress intended that broad principles of equity should guide the award of fees under the statute. Specifically, the Senate report states that the pur-

pose of the fee-shifting provision is to "authorize award of attorney fees to the prevailing party in trademark litigation *where justified by equitable considerations.*" S. Rep. No. 93-1400 (1974), *reprinted in* 1974 U.S.C.C.A.N. 7132, 7132 (emphasis added). Indeed, as mentioned earlier, we have recognized that principles of equity should guide the award of fees under § 1117(a). *See, e.g., Otis Clapp & Son*, 754 F.2d at 746. While congressional intent in this regard is not necessarily dispositive, it is worth noting that the "canonical formula" itself seems to derive directly from Congress's intent as expressed in the Senate report proposing the adoption of what would become § 1117(a). S. Rep. No. 93-1400 (1974), *reprinted in* 1974 U.S.C.C.A.N. 7132, 7136 ("It would be unconscionable not to provide a complete remedy including attorney fees for *acts which courts have characterized as malicious, fraudulent, deliberate, and willful.*") (emphasis added).

Thus, Congress expressed its intent that infringing acts be culpable before fees are awarded, but also that broader principles of equity should guide such award of fees under the Lanham Act. Until now, our cases concerning the award of fees to prevailing plaintiffs have centered on culpable infringement rather than whether broader principles of equity may justify shifting of fees. But as far as the goals served by § 1117(a), both of Congress's concerns complement each other—equitable considerations have a broader sweep than the more specific concern that infringers be punished for particularly bad conduct, but the two concerns are not in conflict. *Cf. Turner v. United States Parole Comm'n*, 810 F.2d 612, 614 (7th Cir. 1987) (when interpreting a statute, courts must look to "inferences of [congressional] intent drawn from the statutory scheme as a whole"). Thus, culpable infringement seems a more narrowly defined subset of the many conceivable types of conduct for which fees may be awarded consistent with Congress's broader concern with equitable considerations in enforcement of trademarks. The

district court erroneously confined its analysis to whether the Foundation had shown willful infringement by the World Church and therefore too narrowly interpreted the reach of § 1117(a).

The broad discretion accorded a district court under § 1117(a), which is founded on equitable considerations, is inconsistent with an interpretation that restricts a prevailing plaintiff to recovery of fees only in cases of willful infringement. Therefore, we disagree with the district court's interpretation of § 1117(a) and relevant authority, for neither the statute nor our caselaw requires willful infringement before fees may be awarded to a prevailing plaintiff.

## C. Litigation Misconduct as a Basis for Fee-Shifting Under § 1117(a)

Having concluded that a prevailing plaintiff need not show willful infringement before a case may be declared exceptional, we must now consider whether a defendant's oppressive litigation conduct will support such a declaration. We believe that it can.

We find convincing support for this conclusion in cases examining fee-shifting under the Patent Act. The language of the Patent Act's fee-shifting provision, 35 U.S.C. § 285, which provides that the court in "exceptional cases may award reasonable attorney fees to the prevailing party[,]" is identical to the fee-shifting provision at issue in § 1117(a). Supreme Court precedent teaches that "fee-shifting statutes' similar language is 'a strong indication' that they are to be interpreted alike." *Indep. Fed'n of Flight Attendants v. Zipes*, 491 U.S. 754, 759 n.2 (1989); *see also Pennsylvania v. Delaware Valley Citizens' Council for Clean Air*, 478 U.S. 546, 559 (1986) (noting that "nearly identical" purposes behind statutes lend credence to the idea that they should be interpreted in a similar manner); *Northcross v. Bd. of Educ. of Memphis City Schools*, 412 U.S. 427, 428 (1973)

(per curiam) ("[S]imilarity of language . . . is, of course, a strong indication that two [fee-shifting] statutes should be interpreted pari passu."); *Hairline Creations*, 664 F.2d at 657 (noting that the trademark and patent fee-shifting provisions are "parallel provisions"). Thus, it is appropriate to look to the interpretation of the patent fee-shifting provision for guidance with interpreting § 1117(a). *See Securacomm Consulting*, 224 F.3d at 281 (citing *CJC Holdings, Inc. v. Wright & Lato, Inc.*, 979 F.2d 60, 65 (5th Cir. 1992)).

A review of these patent cases supports the conclusion that cases may be declared exceptional if the losing party has engaged in vexatious litigation conduct. *See, e.g.*, *Read Corp. v. Portec, Inc.*, 970 F.2d 816, 831 (Fed. Cir. 1992) ("[L]itigation misconduct may in itself make a case exceptional.") (internal quotations and citation omitted), *abrogated in part on other grounds by Markman v. Westview Instruments, Inc.*, 52 F.3d 967 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370 (1996). These cases support awarding fees to a prevailing plaintiff because of the defendant's vexatious litigation strategy, even in the absence of a finding of willful infringement. *See, e.g.*, *Beckman Instruments, Inc. v. LKB Produkter AB*, 892 F.2d 1547, 1551 ("Among the types of conduct which can form a basis for finding a case exceptional are willful infringement, inequitable conduct before the P.T.O., misconduct during litigation, vexatious or unjustified litigation, and frivolous suit.") (citation omitted). Given the similar aims protected by both the patent and trademark laws, and the identical language used in the respective statutes, we believe that the Federal Circuit's examination of fee-shifting under the Patent Act lends strong support to our interpretation of the parallel fee-shifting provisions of § 1117(a).

We also find support for our analysis in the Third Circuit's interpretation of § 1117(a) in *Securacomm Consulting*, 224 F.3d at 273. As the district court noted, the facts in *Securacomm Consulting* bear some similarity to the facts of

this case, at least to the extent that the *Securacomm Consulting* defendant engaged in numerous vexatious acts during the course of litigation. The plaintiff, which owned the registered mark "Securacomm Consulting," sued Securacom Incorporated for various Lanham Act violations. *Id.* at 274. The corporate defendant committed numerous acts of misconduct throughout the ensuing litigation. For example, at the outset of the lawsuit, an officer of the defendant threatened to "bury [plaintiff] financially and take everything he had." *Id.* at 275. The defendant also filed suit in state court accusing the plaintiff and its lawyers of numerous criminal, tortious, and unethical acts.[5] *Id.* at 276. The defendant's claims were later dismissed as meritless, *see id.*, and the plaintiff subsequently prevailed in its Lanham Act suit. *See id.* at 276-77.

The district court then determined that the case was exceptional and awarded the plaintiff attorneys' fees, because the defendant had "sought to secure use of the trademark . . . not simply through fair and vigorous use of the legal process . . . [but] by first engaging in bad faith negotiations and then seeking to destroy a financially weaker adversary through oppressive litigation tactics." *Id.* at 277 (citation omitted). The Third Circuit affirmed the district court's order awarding fees under § 1117(a). The court explicitly rejected the defendant's assertion "that willful infringement is the only culpable conduct by a defendant that renders a case exceptional." *Id.* at 280. Instead, the court referred to

---

[5] Specifically, the defendant charged the plaintiff and its attorney with "attempted extortion, business interference and interruption, malicious prosecution, scheming and artifice to defraud and to obtain money by means of false and fraudulent pretenses and misrepresentations, and RICO violations." *Securacomm Consulting*, 224 F.3d at 276. Apparently, because he was named a defendant in these charges, the plaintiff's attorney was forced to withdraw from the case. *See id.*

its prior interpretations of § 1117(a) and concluded that "by explicitly referring to bad faith, fraud, or malice as other examples of culpable conduct that might warrant a finding of exceptionality, . . . we recognized that culpable conduct comes in a variety of forms and may vary depending on the circumstances of a particular case." *Id.* (internal quotation marks and citation omitted).

In *Securacomm Consulting*, the court determined that culpable conduct that justifies an award of fees "may be broader than willful infringement." *Id.* The court noted that "[a]lthough culpability is often based on the infringing acts, we have not suggested that that was the only conduct that would qualify as exceptional enough to warrant a fee award." *Id.* Thus, the court concluded that the language of §1117(a) authorizing fees does not distinguish between prevailing plaintiffs or defendants and therefore "does not preclude using litigating conduct as a basis for the fee." *Id.*

The Third Circuit evaluated the Lanham Act's legislative history and, consonant with our own analysis, concluded that Congress's broad view of equitable considerations allows a court "to assess the totality of the circumstances in each case[,]" and thus "culpable conduct of a defendant in the act of infringement is a relevant factor to consider, [but] it is not exclusive of other equitable considerations." *Id.* at 281. *Securacomm Consulting* also provided an evaluation of the parallel considerations undergirding the identical fee-shifting provision in the Patent Act and reached the same conclusion we do—namely, that the Federal Circuit's interpretation of the fee-shifting provision of the Patent Act provides strong support for a broad view of § 1117(a) that allows a prevailing plaintiff to recover fees for a defendant's litigation misconduct. *See id.* at 282. Thus, the Third Circuit's analysis closely tracks our own and further supports our conclusion.

Pursuant to § 1117(a), a case may be declared exceptional and fees may be awarded to a prevailing plaintiff where the defendant's litigation conduct was oppressive. This interpretation seems particularly apt given the Supreme Court's disapproval in *Fogerty* for a dual standard with regard to attorneys' fees and because a district court has broad discretion under § 1117(a) to fashion an appropriate remedy according to equitable considerations. Just as a plaintiff's litigation conduct may be found oppressive because it has unreasonably increased the cost of defending against its trademark suit, there is no doubt that an accused infringer's conduct in defending the suit may also be so unreasonable that it could be labeled oppressive. Because a prevailing defendant may recover fees based on the other party's litigation conduct, an evenhanded application of § 1117(a)'s fee-shifting provision would allow a prevailing plaintiff to do the same.

We note that some courts interpret § 1117(a) more narrowly. *See, e.g.*, *Procter & Gamble Co. v. Amway Corp.*, 280 F.3d 519, 527 (5th Cir. 2002) ("The prevailing plaintiff must show a high degree of culpability by the defendant. We have used 'bad faith' as a short-hand for conducting this inquiry[.]") (internal quotations and citations omitted); *Very Minor Leagues*, 223 F.3d at 1148 ("[P]laintiffs only get attorney fees when defendant's [sic] acts of infringement are in bad faith[.]"). *But see, e.g.*, *Aromatique*, 28 F.3d at 877 ("Succinctly put, an exceptional case within the meaning of [§ 1117(a)] is one in which one party's behavior went beyond the pale of acceptable conduct."); *Sara Lee Corp. v. Bags of New York, Inc.*, 36 F. Supp. 2d 161, 170 (S.D.N.Y. 1999) ("The broader question is whether a defendant's deliberate misconduct caused such unwarranted delay and expense for which the plaintiff deserves compensation."). But, for the reasons given, we believe that our interpretation (and that of the Third Circuit) comports with a broader view that addresses the equitable considerations underlying the

purpose of § 1117(a) and is consistent with the party-neutral approach favored in *Fogerty*.

Vexatious litigation conduct is analogous to the oppressive conduct that we have found adequate to render a case exceptional and justify award of fees to prevailing defendants under § 1117(a). This conclusion does not contradict our earlier pronouncements regarding what constitutes the exceptional case under § 1117(a), but instead clarifies that willful infringement is not the only justification for awarding fees to a prevailing plaintiff.

**D.  This Case is Exceptional**

The facts in *Securacomm Consulting* are more like the facts of this case than the facts in any of our previous cases regarding § 1117(a). Indeed, the World Church's conduct in this case was much worse than that of the *Securacomm Consulting* defendant.

We have no difficulty concluding, after taking all factors into consideration, that this case is exceptional under the proper interpretation of § 1117(a) and our caselaw. As detailed at some length in this opinion, the record in this case is replete with evidence that the World Church, under Hale's leadership, purposely orchestrated a campaign of harassment throughout the litigation below which targeted the Foundation and its attorneys. The record discloses considerable evidence that the harassment was intended to force the Foundation and its attorneys to drop the trademark claim and to drive up the costs of litigating the case. The harassment was particularly egregious because much of it consisted of explicit threats of violence and thus was tortious or even criminal in nature—best evidenced by the acts giving rise to Hale's eventual prosecution and conviction for attempting to have the presiding district court judge

murdered. By any reasonable measure, the World Church's actions were egregious and beyond the pale of acceptable litigation conduct.

Evidence in the record also indicates that the World Church set out to purposely flout the district court's injunction (not to mention the criminal activities in which Hale and other World Church members engaged) and thus to purposely infringe the Foundation's registered mark. Certainly, it appears that the World Church's stated goal was to increase unreasonably the Foundation's costs of prosecuting its meritorious trademark claims, and by all indications it succeeded in this goal.

The district court itself recognized the extent of the World Church's misconduct when it condemned what it found to be "Hale's and his followers' reprehensible conduct" and declined to accept any argument "that harassing, anti-Semitic communications and threats to the Foundation's counsel" are protected by the First Amendment. *Foundation II* at *2 & n.2. We agree that any argument that the World Church's litigation misconduct amounts to constitutionally protected free speech likely would be a nonstarter (although, as noted, the World Church made no argument at all in response to the Foundation's appeal), and we conclude that the World Church's actions qualify this case as exceptional pursuant to the proper interpretation of § 1117(a). It now remains for the district court on remand to assess an appropriate award of attorneys' fees. It brings us no satisfaction to prolong a final resolution to this long and unpleasant case, but the Foundation was vindicated on the merits and is entitled to have its motion for attorneys' fees heard under the appropriate standard.

One final note. The conclusion we reach today should not be viewed as a green light for prevailing parties automatically to seek fees under § 1117(a) simply because the other

side has engaged in vigorous litigation. Playing hard—by the rules—cannot suffice to make a case exceptional under § 1117(a). As we have said previously and repeat here, litigation conduct must rise to the level of oppressive in order to justify declaring a case exceptional. *See Door Systems*, 126 F.3d at 1031 (defining an oppressive suit as "something that might be described not just as a losing suit but as a suit that had elements of an abuse of process, whether or not it had all the elements of the tort."); *see also id.* at 1032 ("[A] suit can be oppressive because of lack of merit and cost of defending."). Obviously, aggressive litigation conduct undertaken in good faith and falling within the bounds of zealous advocacy is a far cry from the sort of egregious harassment—found in this case—which clearly qualifies as oppressive. District courts should use the broad equitable powers afforded them under § 1117(a) to ensure that declaring a case exceptional and awarding fees to the prevailing party properly serves the statute's goals of enforcing the trademark laws.

### III. Conclusion

In sum, we conclude that the district court erroneously interpreted the scope and meaning of § 1117(a) with respect to whether a prevailing plaintiff must show willful infringement before the case may be declared exceptional and fees awarded. Because of the World Church's oppressive litigation conduct, this case qualifies as exceptional under the proper interpretation of § 1117(a). We therefore REVERSE the judgment of the district court and REMAND the matter for further proceedings consistent with this opinion.

<span style="float:right">No. 03-4085</span>

A true Copy:

    Teste:

_____

*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*
